MONROE, C. J.
(concurring in part and dissenting in part). The petitions in the seven suits of which this is a consolidation are framed in practically identical terms, save that they describe different tracts of land and join different parties as codefendants with the defendant named in the title, and, in one instance, make it the sole defendant. They merely allege that plaintiff is the owner of the lands described, and that the defendants, respectively, are slandering its title; the main defendant, by claiming ownership of the minerals underlying the lands, and the others, by claiming to hold valid leases for the .development of the minerals.
The main defendant filed answers in all of the cases; but, of its codefendants, only the Gulf Refining Company, in suit 8198, Louisiana Oil Refining Company, in suit 8199, and Producers’ Oil Company, in suit 8200, appear to have answered. No steps have been taken against the others, save in suit 8197, wherein judgment by default was entered. The answers admit plaintiff’s ownership of the described lands, exclusive of the minerals and mining rights, which they allege were specifically excepted and reserved from the sale whereby plaintiff acquired the lands and were made the subject of the leases held by the codefendants. The “answer” (or replication, as I shall call it), filed by plaintiff, contains the following, >vith other matter, to wit:
“Petitioner admits that defendant attempted to acquire title to said minerals, by an act of sale from J. M. Nabors, as alleged, but shows that said pretended act of sale ivas without legal consequence and that said J. M. Nabors could not sell to defendant the oil, gas, and other minerals underlying the said land, for the reason that same had not been developed or reduced to possession; nor had it been shown to exist under said land, and that, until said minerals were either brought to the surface or reduced to possession, or confined within an artificial receptacle, such as an oil pipe, or easing, same was not susceptible of sale, separate and apart- from the land. Petitioner also admits that defendant’s pretended ownership of oil and gas and other minerals is under the claim of title set out in its answer, but denies that said minerals have been developed, and, in fact, shows that said land is undeveloped, and that no attempt has been made to develop it. Petitioner further admits that it acquired title to said land from' the De Soto Land & Lumber Company on February 14, 1910, * * * and that said * * * company acquired said land from J. M. Nabors on May 11, 1906; * * * but denies that said * * * company and your petitioner .are, practically, the same corporation. * * *
“Petitioner reiterates its absolute ownership *113 ofSaid property, including- the-minerals, if any there be thereunder, and denies that said suit was instituted in order to harass the defendant.”
It is further alleged:
“(A) That the reservation of the minerals, including oil and gas, embodied in the sale from ,T. M. Nabors to De Soto Land & Lumber Company was simply a reservation”, of the minerals subject to the stipulation of a sale of said minerals to the Louisiana Coal & Lumber Company, of date January 28, 1904, and was wholly without consideration therefor.
“(B) That defendant’s title, as set out in its answer, is derived from the said Louisiana Coal & Lumber Company, and therefore dates back and refers to the attempted sale of said minerals on January 2S, 1904. * *' *
“(D) That, if said pretended sale or reservation of said minerals ever had any validity at all, which is denied, the same could only be construed to be a real servitude and has been lost by nonuser by the defendant and its authors in title.
“(E) That more than 10 years have elapsed since said pretended sale of said minerals by J. M. Nabors to the Louisiana Lumber Company, defendant’s authors in title, and the plea of 10 years’ prescription is herein specially pleaded as a bar to defendants’ claim to said minerals, if any it ever had.”
The prayer is that—
•There be judgment decreeing plaintiff to “be the owners, in fee simple, and in actual possession, of the land described in the original petition; and further decreeing the attempted reservation of minerals, especially the oil and gas, in the deed from J. M. Nabors to the De Soto Land & Lumber Company * * * of May 11, 1906, and the sale * * * from said Nabors to Louisiana Coal & Lumber Company of date January 28, 1904, to be null and void, and, in the alternative, if the court should find the said reservation or sale had any validity, then that it was only a real servitude, lost by ten years’ nonuser; and that petitioners’ plea of prescription be maintained, etc.”
Plaintiff alleges, in its application for reliearing, that there is error in the ruling that the prescription pleaded was interrupted by the reservation in the sale by W. A. and J. M. Nabors to the De Soto Land & Lumber Company of May 11, 1911. Defendants allege error in the finding 'that oil and gas are insusceptible of ownership until brought to the surface and reduced to possession; also, in the ruling as to the sufficiency of the reservation of the minerals underlying the S.- W. *4 of Sec. 25 and S* E. % of Sec. 26, T. 12, R. 12, and the consequent maintenance of plaintiff’s claims in the suits Nos. 8200 and 8203, and judgment, decreeing it to be the owner in “fee simple” of these subdivisions.
Considering the matter last mentioned, it appears that J. M. Nabors owned the 820 acres above described, and we are informed by the application for rehearing that he did not own the S.’ E'. % of Sec. 25, or the S. W. % of See. 26; that, in the sales to the Louisiana Coal & Lumber Company on January 28, 1904, the tracts that he owned (being the S. W. % of Sec. 25 and S. E. % of Sec. 26) were so misdescribed, and that the error -was repeated in the resale by that company to Nabors, of January 22, 1911, and in the sale by him to the Nabors Oil & Gas Company of August 14, 1911, but that the grantees in each instance were unaware that the error existed and were left undisturbed in c mtrol of the misdescribed tracts. Some years later, however, the error of description haying been discovered, Nabors, on July 2, 1914, executed another act conveying the property by a correct description, to the Nabors Oil & Gas Company for the recited consideration of $1 “and other valuable considerations” ; the reasonable presumption , being that he received nothing, since the purpose of the act was merely to correct the description of the two quarter sections of land (among several thousands of acres) for which he had already .received consideration and which had been delivered to the several buyers but were incorrectly described. The opinion heretofore handed down criticizes some of the stipulations of the conveyance, which-' declare that the buyer is. to enjoy the u'se of the surface of the tracts .to the extent *115 necessary to enable it to get out the oil and gas, and that it is thereafter to receive the rentals and royalties produced therefrom; but they seem to have been perfectly natural stipulations, such as we' usually find in conveyances or reservations of minerals.
In the meanwhile, the tracts in question, correctly described, had been sold by Nabors, on May 11, 1911, to the Be Soto Land & Lumber Company, with the following stipulation, to. wit:
“It is further stipulated that all mineral rights are expressly reserved, having been heretofore sold by the present vendor to the Louisiana Coal & Lumber Company, Limited, subjected to the stipulation contained in such sale of mineral rights to said company.”
The opinion handed down, referring to the sale, observes that it purports to have been made for “$1.00 and other valuable considerations”; that no proof was offered and it was not argued that it was made for the purpose of correcting an error or omission in a previous deed; that “the only argument in defense of the suits Nos. 8200 ¿nd 8203 (in which the disputed tracts are involved) is the contention that the “stipulation, in the deeds from W. A. Nabors and J. M. Nabors to the Be Soto Coal & Lumber Company, that mineral rights are expressly reserved, having heretofore been sold to the Louisiana Land & Lumber Company, Limited, subject to the stipulation contained in such sale of mineral rights to said company,” must apply to the mineral rights on the tract of 320 acres, described as S. W. % of Sec. 25 and S. E. 14 of Sec. 26, even though the mineral rights on that tract of land had “not then been sold by either W. A. Nabors or J. M. Nabors to the Louisiana Coal & Lumber Company, or to any one else.”
That view of the matter ignores the real facts of the situation; the rights of the parties to the contract whereby the Be Soto Land & Lumber Company acquired the 320 acres; and their agreement and understanding as to its purpose and effect. Both quarter sections are included in the conveyance from J. M. Nabors to the Be Soto Land & Lumber Company, of May 11, 1911, which is signed by J. M. Nabors for himself, and by A. J. Peavy for the Be Soto Company.
It is admitted that both subdivisions, constituting one tract, belonged, at that -time, upon the face of the record, to the vendor, although he had, previously, as he believed, sold the underlying minerals to the Louisiana Coal & Lumber Company, but as, in that sale, (hey (the subdivisions) were, through error, described as the S. E. % of Sec. 25 and S. W. % of Sec. 26, instead of S. W. % of Sec. 25 and S. e". % of Sec. 26, and he did not own the land, as thus described, there was, technically, no sale. That which he did own, and sell to the Be Soto Land & Lumber Company, was correctly described, and, being the owner, he was at liberty to-sell it, or so much of it as he thought proper, upon any terms that he saw fit, that were not prohibited by law and that the purchaser was willing to agree on, and he was under no obligation, in making the sale, to assign a reason for excepting and reserving therefrom any part that he chose to except and reserve. But he was under the obligation, that rests upon every man, to be truthful in his dealing's, and believing, as he did, that he no longer owned the underlying minerals, he could not truthfully declare without qualification in his contract that he then reserved them; and therefore caused the statement to be made that he reserved them, because he had sold them; but it is perfectly manifest, from the testimony of plaintiff’s witnesses, and from all the circumstances of the ease, that the intention was to reserve them, and, inasmuch as that intention was expressed in the contract, it is entirely immaterial what reason he gave, or whether he gave any, the fact being that he did not sell the minerals to the *117 He Soto Company and that company, through its representative, knew that it was not buying them and was paying nothing for them.
The printed argument of the learned counsel for plaintiff contains the following, by way of preface, to wit:
“However, as stated by the plaintiff, on the trial hereof, all claim to the solid minerals was waived, and its claim restricted entirely to oil and gas underlying the various lands described in the petitions. As to the latter, the claim may be divided into two classes:
“First. It claims to have acquired, the S. W. of Sec. 25 and the S. E. % of Sec. 26, through the He Soto Land & Lumber Company, which acquired from J. M. Nabors, on May 11, 1906, and that said lands were acquired, in both transfers, free from any reservation of minerals.
“Second. It claims that the minerals underlying the other lands were segregated and sold, separate from the land, to the Louisiana Land & Lumber Company, in 1904, and that, no attempt having been made, within 10 years after the sale of said minerals, to develop the same, all rights thereto have been lost by the prescription of 10 years, liberandi causa.”
After quoting the stipulation as to mineral rights, contained in the sale from Nabors to the He Soto Company, the argument proceeds:
“But this deed conveyed a large acreage, in addition to the two tracts, and it is apparent, from a careful reading of the reservation, that it was the intention only to. reserve the minerals underlying these lands included in said deed in which the minerals had been previously conveyed by the vendor to the Louisiana Coal & Lumber Company, Limited. This is further borne out by the testimony,” etc.
It áppears from the record that J. M. Nabors has long been a strong believer in the mineral wealth of He Soto parish. He had during many years preceding the transactions out of which this suit has arisen, devoted no little time and money in various efforts to develop it, by the organization of companies and the employment of experts. Through his instrumentality, coal had been actually mined and a carload sent to St. Louis (to the Exposition, if I mistake not), and he seems to have loaded himself with lands, the value of which, for ordinary purposes, was next to nothing, because of. his faith in their coal, and, later, in their oil and gas possibilities; the transactions preceding this suit having involved over 7,000 acres, and the price received for those sold to the plaintiff herein, and which were sold for the timber, and exclusive of the minerals, having been but $1 per acre! The Louisiana Coal & Lumber Company was principally a. “Nabors” corporation, composed, as I infer, of members of that family and a few of their friends. The Nabors Oil & Gas Company I take to have been similarly organized. Its main assets appear to have consisted of the minerals and mineral rights conveyed by J. M. Nabors and others of his name; and of.hiS many dealings in lands, disclosed by the record, there is not one in which he was not on the side to which, or by which, the mineral rights were conveyed or reserved.
On the other hand, it may be here stated that the He Soto'Land & Lumber Company, as the name indicates, was at that time engaged in the land and lumber business, and, it is shown, took no interest, in minerals, and that on February 14, 1910, it made a conveyance, omnium bonorum[1], to the Frost-Johnson Lumber Company, the facts in that connection being that the same persons who owned, say 95 per cent- of the stock, and were the managers of the one company, being similarly situated- as to the other; the circumstance that, although the He Soto Company, which had taken title to the lands in question, with the .exception and reservation of the minerals and mining rights, conveyed them to the Frost-Johnson Company, without exception or reservation, therefore, counts for nothing, and is not seriously urged.
Mr. A. J. Peavy, plaintiff’s vice president *119 rind' general manager, called as a witness for plaintiff and examined by its counsel, testified that he conducted the negotiations on behalf of the De- Soto Land & Lumber Company with-the Nabors family- for the purchase of the lands; that negotiations to buy the timber alone were first. entered upon, and that, “on the final wind up-,” the De Soto Company bought some timber and some land; and, further, as follows:
'“Q. Do you recall the value placed upon the land-when it was put in, and what was said with reference to the mineral rights? A. I don’t know that I can give all that was said. We didn’t buy the mineral rights. My negotiation was that the consideration was $l-per acre. * * * Q. What was the land chiefly valuable for, in your opinion, for your purposes; was it for the timber, or for the land? A. It was valuable for the timber, to us. Q. What, if anything, did you regard the minerals as being worth? A. I didn’t regard them as being worth much. Q. What value, if any, did Mr. Nabors seem to place on that land; I mean the minerals on that land? A. Well, I couldn’t tell you how much value he placed on the land for the mineral rights. He thought a great deal more of the mineral rights than we did. He didn’t mention any particular figure to me, that I remember, to base an' idea about whát he thought they were worth. He seemed to think a great deal of the mineral rights; we didn’t. Q. Did you understand you could have bought the land and timber at all without the reservation of the minerals-to the Nabors? A. I don’t think I could. With the first negotiations that were brought up, Mr. Nabors told me that the mineral rights were reserved.”
Counsel for plaintiff cross-examined his own witness at considerable length, and also examined Mr. R. T. -Moore, plaintiff’s secretary, ' treasurer, and general manager, at Mansfield, also a stockholder (as is Mr. Peavy), but I find nothing in the testimony of either upon which to base the shadow of a doubt that the lands in question were bought for the timber, - without the slightest intention or expectation of buying, and, still less, of .paying' for, - any minerals that might underlie them; but, to the- contrary, with a- perfect Understanding, on-, both sides, that the minerals and mineral rights were to be, and were, excepted from the sale- and reserved to the seller.
The second “claim” set out as part of the text of the argument on behalf of plaintiff, i. e. that, the minerals in question having been sold separately from the lands in 1904, and no attempt having been made to develop-them, within the more than 10 years which elapsed between 'that time and the bringing-up of this suit, “all rights thereto have been lost by the prescription of ten years, liberandi causa,” is equally unsustainable.
In the case of Frost-Johnson Lumber Co. v. Lottie A. and Ernest N. Saelling (No. 22916 of the docket), now pending on application for rehearing, the pleadings were found to be consistent in asserting ownership- of the minerals and mining rights (though the-ownership is said to result from the operation of the prescription liberandi causa, which counsel, in that case, were careful to. point out. is not a prescription aequirendi causa); and it was only in the argument that it was asserted that the property, the ownership of which was thus claimed, is not susceptible of ownership until brought to the surface and reduced to possession. .
The writer and Mr. Justice ¡30MMER-VILLE therefore, 'concluded that the issue of susceptibility vel non, tendered only in the argument, arid conflicting with the assertion of ownership, contained in the pleadings, was not in the case and could not be considered. It was alleged, in the pleadings in that case, that the reservation of “all minerals,” and of the right to dig for the solids and to bore and explore for oil and gas, did not include a reservation of ownership in oil and gas, but created merely a real right or servitude, the exercise of which was barred for nonuser, under article 789 ot' the Civil Code, the writer and Mr. JusticeSOMMERUILL'E found, however, that, its-judicial, allegations and admissions, inelud *121 ing the averment that a servitude was established, were conclusive against' plaintiff to that effect, and that, necessarily, two estates were created, since C. C. 64S, declares that, “to establish a predial, or real, servitude, there must, first, be.two different estates, one of which owes the servitude to the other,” and that, as to the servitude so established, the question, of prescription is governed, not by C. C. 7S9, but by C. O. 795 and 053, reading:
“Art. 795. * * * Prescription for nonusage does not take place against natural or necessary servitudes, which originate from the situation of the places.”
Art. 653. * * * Servitudes being essentially due from “one estate to another for the advantage of the latter, they remain the same as long as no change takes place in regard to the two estates, whatever change may take place in the owners.”
The plea of prescription was therefore thought to have been properly overruled, and it should now be so held in this case; the question presented by plaintiff’s allegations (herein below quoted from its replication) concerning the insusceptibility of the oil and gas to “sale,” until brought to the surface and reduced to possession, constituting no obstacle to that holding.
Considering, then, whether the quéstibn thus referred to has been properly put. at issue by the pleadings in this case, I find that the petition herein (paragraph 1) alleges that plaintiff “is the true and lawful owner * * * of the lands herein described” .; that in its replication to the answers of the defendants (paragraph 1) it “reiterates” the allegation contained in paragraph 1 of the petition; that, in paragraph 2 of the replication, it admits that defendant attempted to acquire title to said minerals (including, oil and gas) by an act of sale.from J. M. Nabors, but it ■“shows” that said .pretended act “was -without legal -consequence, -and that said J. M. Nabors” could not sell, to “defendant the oil and gas and other minerals underlying said lands for thé reason that the s'ame had not been developed or reduced to possession; nor had it been shown to exist in, and under, said lands; and that, until said minerals were either brought to the surface and reduced to possession; or confined within an artificial receptacle, such as an oil pipe, or casing, same were not susceptible of sale, separate and apart from the land. Petitioner * * * denies that said minerals have been developed,' and, in fact, shows that the land is undeveloped and that no attempt has. been made to develop it.” Paragraph 3 of the replication reads, in part:
“Petitioner reiterates its absolute ownership-of said property, including the minerals if any be thereunder,” etc.
I therefore find sandwiched between distinct, iterated, and reiterated allegations of ownership in the minerals, with no exception as to oil and gas, the averment that the minerals are not susceptible of being sold, until brought to the surface and reduced to possession; followed by the averment that the oil and gas here in question have not been so reduced to possession; and those allegations followed by the prayer that there-be judgment decreeing plaintiff “to -be the owner - in fee simple,” and in the actual possession of the land described, and, in the alternative, if the court should find that “said -reservation, or sale, ever had any validity,-then that it was-only a real .servitude, lost by 10 years’ nonuser,” etc.
To th'e petition and replication, so filed,, certain grounds of objection- appear to me to “jump-to the eye”; for the Code of Practice-declares that- “neither replication nor rejoinder shall be admitted” (article 329); it prohibits the cumulation of several demands in the same action when one of them is-contrary to, or precludes, the others -(article 149); provides that, when two causes of action, • contrary to, and exclusive of, each *123 other, 'shall have been so cumulated, the defendant may refuse to plead to the merits until plaintiff shall have chosen between them; and that, if the exception be sustained, plaintiff shall amend his petition, so as to preserve only one cause ; otherwise the suit shall be dismissed. It seems clear, therefore, that plaintiff is asserting ownership in oil and gas by attacking the title under which it claims, on the -ground that oil and gas are not susceptible of ownership; and, yet, is relying on the prescription liberandi causa as a means of acquiring those minerals.
No objection, however, on the part of the defendants, upon any of the grounds thus mentioned, appears to have been made; and, though the statute requires the dismissal of a suit based on conflicting demands, where the plaintiff, having been called on to elect and amend, has failed to do so, it does not so require where there has been no such call and failure; and the rulings of this court in cases presenting that situation have varied with a view of doing substantial justice in such cases. Cross on Pleading, p. 65 et seq. But, for the court to choose for plaintiff or defendant which of two conflicting causes of action or grounds of defense shall survive and be held to constitute the basis of the action or defense, is open to the objection that the one litigant, or each of them, may think that he has thereby been prejudiced and his opponent favored; and that it is the province of the litigant, and not of - the court, to determine upon which, of 'perhaps several grounds, he shall eventually rest his case.
In Mackroy v. Holton, 8 La. Ann. 50, where the claims of the plaintiff were said to conflict, as the case was presented to this court, it was held, in effect, that, taking the case as it found it, the court was enabled to do substantial justice between the parties, and the judgment was rendered upon that basis. I therefore take this case as I find it, and with the less embarrassment, on account of the conflicting positions which plaintiff seems to have assumed, that, after carefully considering the -whole case, 'I have reached the conclusion that, upon no supposed cause of action, or theory, propounded by it, is it entitled either to the special judgment prayed for or to any other judgment, on its prayer for general relief.
I assume that, in alleging that oil and gas are not susceptible of “sale,” until brought to the surface and reduced to possession, plaintiff means to say that those minerals are not susceptible of ownership until thus reduced to possession, and, without discussing that postulate, I proceed to the consideration of the question, as stated, by making the following excerpt from the opinion (concurred in by the writer and Justice SOMMERVILLE) in the case of Frost-Johnson Lumber Co. v. Heirs of Lottie A. and Ernest N. Sailing (to which I have already referred), to wit:
“We are to bear in mind that the contract to be interpreted was entered into in Louisiana; to be wholly executed here; that it concerns only questions of ownership, and other rights, in immovable property, here situated; and that the conformity to the Constitution of the United States, of' the law of Louisiana, governing those questions, being wholly undisputed, they are to be decided in accordance with that law, and no other” — citing authority.
The provisions of the law of Louisiana[1] which appear pertinent and sufficient are to be found in certain articles of the Civil Code, the substance or text of which may be stated as follows:
By articles 449 to 459 “things” are broadly classified as being either “common” or “public”; those which are for the common use of the inhabitants of cities or other places; those which, though belonging to such inhabitants, are not for the common use; and those which are susceptible of private ownership.
*125 Other articles provide that—
“483. Things susceptible of [private] ownership are all those which are held by individuals and which may be alienated by sale, exchange, donation, prescription or otherwise.
“484. Individuals have the free disposal of the property which belongs to them, under the restriction established by law. * * *
“4SS. Ownership is the right by which a thing belongs to some one in particular, to the exclusion of all other persons.”
“490. Ownership is divided into perfect and imperfect. Ownership is perfect, when' it is perpetual, and when the thing is unincumbered with any real right towards any other person than the owner.
“On the contrary, ownership is imperfect, when it is to terminate at a certain time or on a condition; or if the thing, which is the object of it, being an imlnovable, is charged with any real right toward a third person; as a usufruct, use or servitude. * * *
“491. Perfect ownership gives the right to use, to enjoy and to dispose of one’s property in the most unlimited manner, provided it is not used in any way prohibited by law or ordinances. * * *
“492. Imperfect ownership only gives the right of enjoying or disposing of property, when it can be done without injuring the rights of others; that is, those who may have real or other rights to exercise upon the same property.”
“494. It is of the essence of the right of ownership that it cannot exist in two persons for the whole of the same thing; but they may be the owners of the same thing in common, and each for the part which he may have therein.”
“496. The ownership and the possession of a thing are entirely distinct. The right of ownership exists, independently of the exercise of it. The owner is not less the owner because he performs no act of ownership, or because he is disabled from performing any such acts, or even because another performs such acts without the knowledge or against the will of the owner.”
“498. The ownership of a thing, whether it be movable or immovable, carries with it the right to -all that the thing produces, and to all that becomes united to it, either naturally or artificially.”
“505. The ownership of the soil carries with it the ownership of all that is directly above and under it. The owner may make upon it all the plantations and erect all the buildings which he thinks proper, under the exceptions established in the title: Of Servitudes. He may construct below the soil all manner of works, digging as deep as he deems convenient,' and draw from them all the benefits which may accrue, under such modifications as may result from the laws and regulations * * * of the police.”
509 (quoting in part). “The accretions, which are formed successively and imperceptibly to any soil situated on the shore of a river or other stream, are called alluvion. The alluvion belongs to the owner of the soil situated- on the edge of the water, whether it be a river or stream, and whether the same be navigable or not,” etc.
“519. Pigeons, bees or fish, which go from one pigeon house, hive or fish pond, into another pigeon house, hive or fish pond, belong to the owner of thobe things; provided, such pigeons, bees or fish have not been -attracted thither by fraud or artifice.”
Articles 647 and 648 provide that:
647. A real or predial servitude is a charge laid on an estate for the use and utility of another estate belonging to another owner.
648. It follows that, to establish a predial or real servitude, there must first be two different estates, one of which owes the servitude to the other.
Articles '652, 653, 654, 658, 659, 709, 665, and 667 provide that: '
652. A servitude is an incorporated right which cannot exist without the estate to which it belongs.
653. Servitudes remain the same so' long as no change takes place in the owner.
654. Servitude is a right so inherent in the estate to which it is due that the faculty of using it, considered alone, cannot be given, sold; or let, or mortgaged without such, estate, because it does not pass without the estate.
658. The part' of an estate upon which the servitude is exercised does not cease to belong to the owner of the estate.
659. Servitudes arjse from the natural situation of places, from obligations imposed by law, and from contracts between the respective owners.
665. Servitudes imposed for the public or common utility relate to the space which is to •be left for the public use by the adjacent proprietors on the shores of navigable rivers, and for the making and repairing -of roads, levees, and other public or common works.
667. Although a proprietor may do with his estate whatever he pleases, still he cannot; make any work on it which may deprive his neighbor *127 ■of .the liberty of enjoying his own, or which may be the canse of any damage t9 him.
709. The owners of estates’ may establish such servitudes on, and in favor of, their estates as they think proper, provided that the services be not imposed on, or in favor of, the person, and that they imply nothing contrary to public order.
722. When a servitude results from a contract, its extent and method of use are regulated by'the contract.
747. A servitude may be established in favor ■of an estate which does not exist, or of which one is not yet the owner, but fails in the event the hope of becoming the owner is not realized.
“1764. All things not forbidden by law may legally become the subject of or motive for contracts,[1]’’ etc.
“1903. * * * The obligation of contracts extends, not only to what was expressly stipulated, but, also, to everything that, by law, equity, or custom, is considered as incidental to the particular contract or necessary to carry it into effect.”
“1885. All.things, in the most extensive sense of the- expression, corporeal or incorporeal, movable or immovable, to which rights can be legally acquired, may become the subject of ■contracts.”
Articles 1997, 2012, and 2013 provide that:
1997. An obligation is real when it is attached to immovable property and passes with it into whatever hand.s it may come, without making the third possessor personally responsible.
2012. Real obligations may be created: (1) By. the. alienation of immovable property, subject to a real condition, expressed or implied; (2).: by alienating to one person the immovable property and to another some real right to be exercised thereon; (3) by creating a right of mortgage upon the immovable property.
“2013. The real- obligation, created by condition annexed to the alienation of real property, is susceptible of all the modifications that the will of the parties can suggest, except such as are forbidden by law.”
“2448. Any effects of commerce may be sold, when there exists no particular law to prohibit the traffic thereof.
“2449. Not only corporeal objects, such as movables and immovables, live stock and produce, may .be sold, but also incorporeal things, such as a debt, an inheritance, * * * a servitude or any other rights.”
Articles 2450 and 2451 provide that:
“2450. A sale is sometimes made of a thing to-come: As of what shall accrue from an estate, of animals yet unborn, or such like other things, although not yet existing.
“2451. It also happens * * * that an uncertain hope is sold; .as the fisher sells the haul of his net before he throws it; and, although, he should catch nothing, the sale still exists, .because it was the hope that was sold, together with the right to have wha^ might be caught.”
By Act 31 of 1910’, p. 50, tlie General Assembly authorized the register of the state land office to soil to the city of Shreveport “all that portion of land belonging to the state * * * in what is known as the bed of Cross Lake * * * reserving to the state of Louisiana all minerals and mineral rights on and under said lands.”
Ownership, then, is á right created .and regulated by law, and the enactment and enforcement of laws for the protection of which is one of the main purposes of all civilized government. The law applicable to this case, as may be seen from the foregoing résumé of some of its provisions, declares that some things are susceptible of ownership and others are free to all men; that some are susceptible of private ownership, and that the ownership of others is vested in the nation, or the state, or in municipalities. Among those which are declared to be susceptible of private ownership is land, and we have the specific declaration that—
“The ownership of the soil carries with it the ownership of all that is directly above and under it.”
By another provision, we know that the air is free; but there is none which breaks the force of the declaration that the ownership of the soil carries with it all that is under it; and the verb “is” means the present tense, for all time; nor is there any exception, to the ownership thus .declared, of things under the soil, because their presence may be unknown to the owner, or because he may be unable to identify them, or to reduce them to actual imssession, or to perform any act of ownership with regard to them; hence he *129 owns not only “all that is,” but all that may be, under the soil. If that be not true, then, in most cases, the declaration that he owns all that is under the soil means nothing, and he owns nothing, for, in most cases, liis knowledge of what lies under -the soil goes no deeper than the bottom of a furrow, or a ditch, or a well, and what he may find at the bottom of a well conveys no certain information as to that which may underlie the soil of his garden,' or his pasture. He owns it “all,” nevertheless, if it be there, and he may dispose of it, “in 'the most unlimited manner,” not prohibited by law. He may therefore sell all that is under the soil, or his right of ownership in all, or part of all, that may be there, as he and his buyer may agree, for there is no law which prohibits a contract of that character. To the contrary, article 17G4 (supra) provides that “all things not forbidden by law, may legally become the subject of, or motive for, 'contracts.” Article 2449 declares that “not only corporeal objects * » * may be sold, but also incorporeal things, such as a debt, an inheritance, * * * a servitude, or any other rights.” And articles 2450 and 2451 provide that one may sell things to come, “although not yet existing,” as “animals unborn, and such like things,” or the haul of a net, before the net is thrown, for it is the hope that was sold, “together with the right to have what might be caught.”
In Losecco v. Gregory, 108 La. 650, 32 South. 983, it appeared that plaintiff, an orange merchant, was in the habit of buying orange crops in advance of the seasons in which they were expected to mature, and that, in November, 1S9S, he and defendant entered into the following contract, to wit:
“I have this day, in consideration .of the terms hereinafter named, sold unto Vincent Losecco * * * two crops of oranges on my place as follows, i. e.:
“Eirst. All oranges that my trees may produee- in the year eighteen hundred and ninety-nine (1899).
“Second. All oranges that my trees may produce in the year nineteen hundred (1900) for the sum of eight thousand dollars ($8,000).”
—and it was stipulated that $4,000 should be paid in cash and the balance on December 1, 1900; and that the vendor should furnish teams and carts and drivers to move the crops; to which was added: “Purchaser assumes all risks.”
Within three months, and before the trees had blossomed for even the first crop, they were killed, root and branch, by a freeze: and thereafter plaintiff sued for the recovery of the $4,000 which he had paid, and defendant set up a demand in reconvention for the recovery of the unpaid, balance of $4,000. The case was most exhaustively considered upon the question whether it was the crops that were sold, or the hope of the crops, and the conclusion was that it was the hope, and that plaintiff’s demand should be rejected and defendant awarded judgment for the unpaid balance of the price. The Erench authorities cited seem to be fairly agreed that, where the form of the contract is such as to indicate án expectation that a crop, sold in advance, will certainly be made, its failure, or near failure, will release the purchaser, by reason of the failure of the object of the contract; but that, where the contract is framed in the subjunctive mood, the purchaser may be held bound, as assuming the risk. Mourlon is cited to the following effect (volume 3, p. 193):
“A sale may have for its object future things; for example, the crop of such a vineyard (article 1138). It is important then to know what has been sold. Is it the chance of the crop, or the crop ? * * * By what sign is one to determine whether it is the chance of the crop or the crop that has been sold? The circumstances will enlighten' the judge. It is, above • all, necessary.to compare the price with the .ordinary value of the crop that the vineyard produces. If it is equal, or nearly equal; it will be supposed that it was promised in-exchange *131 for the crop.[1] If it is very inferior, it will he supposed that it was accepted as the equivalent of the chance of the crop.”
The case thus cited has little or no application here, save as illustrating the universally recognized principle that, in interpreting a contract, the duty of a court is to endeavor to ascertain the intention of the parties; and, applying that principle to this case, it appears to me, not only from the language used, but from the oral testimony of plaintiff’s witnesses, that it was not the intention of the parties to the contract upon which plaintiff relies that the one party should buy, or the other sell, any right or interest whatever in the minerals underlying the lands which, with the timber thereon, constituted the subject and object of that contract, and that nothing was paid or received for anything save land and timber; but, to the contrary, that it was well understood that all minerals and mineral rights were excepted and reserved from the sale, and, though the law itself entitled the vendor to such use of the surface of the land as would be considered incidental to the reservations' or necessary to carry them into effect (C. O. 1903), that those rights were especially reserved and constituted all the rights of ownership in the minerals that it was possible, or would become possible for any one to exercise. There being no doubt, then, as to the intention of the parties, the only question that remains is: Did the contract serve to carry thatintention into effect? The intention having been to except and reserve all minerals and mineral rights, it is virtually conceded, by the abandonment of all claim with respect to the solid minerals, superinduced, no doubt, by a practically uniform jurisprudence in all the courts of the country, that the contract did so serve, as to all minerals and mineral rights save those relating to oil. and gas, as to which, it is said that they were not included in the reservation because they are not susceptible of ownership, and are not susceptible of ownership until brought to the surface and reduced to possession, because they are fugacious, or vagrant, in character, and, while under the soil, are held in reservoirs of vast extent, underlying the soil of many tracts, owned by many persons, and may move, or be moved, with great facility from one place to another and change their ownership with each movement, which, it is thought, is inconsistent with' the primary definition of ownership, as “the right by which a thing belongs to some one in particular to the exclusion of all other persons.” O. O. 488. But, whatever may be the more recent legislation in Indiana, or elsewhere, the law of this state, for more than a hundred years, has declared that “the ownership of the soil carries with it the ownership of all that is directly above and under it,” and that language is too plain to admit of a construction that would make it read, “the ownership of the soil carries with it all that is directly above or under it, except oil or gas, which are not susceptible of ownership until brought to the surface and reduced to possession.” The General Assembly, alone, has the power to make a change of that kind,
Moreover, those minerals, as found in Louisiana, are not shown to be at large, or contained in reservoirs so extensive as to allow them great freedom of movement, through vast areas; and, whether they are occluded in, practically, sealed geological formations, or confined in rock, shale, or supersaturated coarse sand, surrounded by impervious sand, are questions of fact, concerning which the record contains no information, and, which cannot be said to be so publicly known and agreed on as to have become proper subjects of judicial cognizance. Feeling, then, that I know little or nothing concerning the mobility of the minerals in question, while in situ, I should be unable, in the absence of evidence, to predicate an *133 opinion upon the facts in that connection. But, assuming that they may, there, move about, and that, in so doing, become the property of one person at one time and of another person at another time, and that controversies should result, it appears to me that the courts would better discharge their functions by deciding these controversies, as presented, rather than by assuming to deny the susceptibility of “ownership” in property which the law declares possesses that attribute. The problem stated cannot be regarded as in all respects a new one in this state; since provision was made for certain phases of it in the Civil Code when that statute was adopted, and probably before that time. Pish undoubtedly possess the faculty of automobility, and, if they are kept in connected ponds, on two estates, or in a single pond, through which runs the line dividing such estates they may change their ownership many times in the course of a day, and bees and pigeons'may thus change their ownérship by changing their hives or houses; for article 519 of our Code so declares, in terms, and the primary definition of “ownership” is- made to yield to such cases. And the same is true, in some respects, as to land; for the accretion upon the shores of rivers and streams belongs to the owner of the lands to which it becomes attached, and continues to belong to him, though, as it sometimes happens, the accretion extends, as the river or stream eats into the opposite bank, and may in time occupy a space formerly on that bank which had been occupied by the land of another (C. C. 509). The primary definition of ownership (as we have called it, merely for convenience) is therefore by no means the only definition of that right furnished by our Code.
Article 494, as may be seen, provides that, while it is of the essence of the right of ownership that it cannot exist 'in two persons for the whole of the same thing, they “may be the owners of the same thing in common, and each for the part which he may have therein.”
Again, article 490 defines perfect and imperfect ownership, and the former appears to be the equivalent of that which, in ocher jurisdictions, is termed “absolute,” and the latter, of that which is termed “conditional,” ownership. 32 Cyc. 676. In Jones v. Forest Oil Co., 194 Pa. 379, 44 Atl. 1074, 48 L. R. A. 748, cited in Ohio Oil Co v. Indiana, 177 U. S. 205, 20 Sup. Ct. 576, 44 L. Ed. 729, the court said, after reviewing certain other cases:
“From those cases we conclude that the property of the owner of lands in oil and gas is not absolute until it is actually within his grasp and brought to the surface.”
In other words, 1 understand the view of the court to have been that, though the ownership was not what we should call “perfect,” it was nevertheless ownership, imperfect in the sense that the ownership of any other mineral, or thing, is imperfect, so long as it is possible that it may be transferred from one person to another without the knowledge of either. Our law, however, recognizes imperfect ownership’ in declaring that ownership may be predicated of things that are known to be nonexistent, as of animals unborn, future crops, etc.; and, a fortiori, may it be predicated of things which may exist but the existence of which has not been proved, as, for instance, particular, solid, minerals in an unproved field. Such minerals are sold and excepted and reserved from sale, every day, and we have not been referred to a case in which it has been held that a sale of them, as in situ, was invalid for lack of an object; the contract in such cases being one of sale, agreeably to which the buyer becomes the owner of the thing sold, if it be found to exist; a chance, the risk of which he may or may not as *135 sume, and which, so far as my observation extends, he does assume, by paying the price agreed on, with no reservation, of the right to reimbursement. In the cases which have come before this court,, however,, the contracts have, usually covered “all minerals,” and, as I apprehend that there is no soil beneath which no inorganic matter is to be found, no question can arise as to the invalidity of su.ch sale, in the lump, of things- known to exist, for lack, or uncertainty, of an object. And, so applying that reasoning to this case, when plaintiff’s authors in title sold the land, reserving all minerals or all mineral rights, the reservation included all inorganic substances, known or unknown, suspected or unsuspected, that were directly under the soil, and, assuming that there are bound to be some such substances at some depth, beneath the soil, of all -land, a separate estate was thereby created, for the benefit of which a predial servitude was, at that same moment, established upon the surface of the land the title of which was then dismembered.
Although, as I have intimated, I do not understand that the decisions of courts of other jurisdictions, including those of the Supreme Court of the .United States, can have any controlling influence in .the determination of the issues here involved, the high respect which all men feel for that great tribunal renders its opinions upon any subject of general concern, a matter of great interest; and, as those who support the doctrine of the insusceptibility of ovmersliip of oil and gas, until those minerals are brought to the surface and reduced to possession, seem to rely, mainly, upon the decision in Ohio Oil Co. v. Indiana, 177 U. S. 190, 20 Sup. Ct. 576, 44 L. Ed. 729, I have thought it u'orth while to examine the opinion in that case with all the care of which I am capable with a view of forming an opin7 ion as to what.was intended, to be decided; the result of the examination being as follows:
The controversy in that case related exclusively to the constitutionality of a statute of the state of Indiana imposing certain restrictions upon persons owning and operating oil and gas wells, in the matter of allowing the gas to escaño, without being sufficiently utilized. It wms alleged by the' state, and seems, by reason of the pleadings, to have been - accepted as true, that, fox-many years there had existed a subterranean deposit of' natural gas, underlying seveix named, aixd other, counties of Indiana; that “said natural gas, underlying, the counties aforesaid and other portions of the state, is contained in and percolates freely through a stratum oí rock known as Trenton Rock, comprising a vast reservoir in which the gas is confiixed uxxder great pressure and from which it escapes, when it is permitted to do so, with great force.”
The suit was brought by the state, under a special statute concerning (inter alia) “The operation of natural gas and oil wells, prescribing penalties and declaring an emergency,” and a restraining order was issued prohibiting the defendant (plaintiff in error) from making a certain disposition of natural gas produced by it, upon the ground that it w-as xvastefxxl and prejudicial to the intex-ests of certain communities and co-owners of the surface from beneath which the gas was obtained.
There was judgmexxt, by the Supreme Court of Indiana (150 Iixd. 60S, 50 N.. E. 1125),- in favor of that state, which was affirmed by the Supreme Coxxrt of the United States; the proposition relied oxx in that tribunal having been that the enforeemeixt of the provisions of the Indiana statute,- as against defendant in injunction, w-as -a restriction upon its right of ownership in, and uso of, the gas, in developing, or attempting to develop, oil, amouixting *137 to a taking of property without due process- of law, in violation of- the “Fourteenth Amendment.” The case was taken up by writ of error, directed to the Supremo Court of Indiana, for a review of a judgment sustaining (on an appeal to that court) a demurrer to the application of plaintiff for an injunction. After saying that it was unnecessary to restate the common-law rule that ownership of the surface carries the right to the underlying minerals, with the privilege of mining them, or to consider the scope of the legislative authority in the matter of the regulation of mining rights, the Supreme Court, through the Chief Justice, proceeded as follows, to wit:
“The question here arising does not require a consideration of the matters just referred to, but it is this: Does the peculiar character of the substances, oil and gas, * * * the manner in which they are held in their natural reservoirs, the method by which and the time when they may be reduced to possession or become the property of a particular person, cause them to be exceptions to the general principles applicable to other mineral deposits, and hence subject them to different rules? True it is that oil and gas, like other minerals, are situated beneath the surface of the earth, but, except for this one point of similarity, in many other respects they greatly differ. They have no fixed situs under a particular portion of the earth’s surface within the area where they obtain. They have the power, as it were, of self-transmission. No one owner of the surface of the earth, within the area beneath which the gas and oil move, can exercise his right to extract from the common reservoir, in which the supply is held, without, to an extent, diminishing the source of supply as to which all other owners of the surface must exercise their rights. The waste by one owner, caused by a.reckless enjoyment of his right of striking the reservoir, at once, therefore, operates upon the other surface owners. Besides,, while oil and gas aré different in character, they are yet one, because they are unitedly held in the place of deposit. In Brown v. Spilman, 155 U. S. 665, * * * these distinctive features of deposits of gas and oil were remarked upon. The court said: ‘Petroleum gas and oil are substances of peculiar character, and decisions in ordinary cases of mining, for coal and other minerals which have a fixed situs, cannot be applied to contracts concerning them without some qualifications. They belong to the mvner of the land, and are a part of it, so long as they are on it or in it, or subject to his control, but when they escape and go into other land, or come under another’s control, the title of the former owner is gone. If an adjoining owner drills his own land and taps a deposit of oil or gas, extending under his neighbor’s field, so that it comes into his well, it becomes his property; [citing] Brown v. Vandergrift, 80 Pa. 142, 147; Westmoreland Nat. Gas Co.’s Appeal, 130 Pa. 235.’ ” (Italics by writer.)
The court then cites the two cases thus cited in Brown v. Spilman, 155 U. S. 665, 15 Sup. Ct. 245, 39 L. Ed. 304, from which the doctrine expressed in the language that we have italicized is taken; cites Hague v. Wheeler, 157 Pa. 324, 27 Atl. 714, 22 L. R. A. 141, 37 Am. St. Rep. 736, in which a party, complained of as wasting gas, was referred to as follows:
“If the use he makes of his own, or its waste, is injurious to the property or the health of others, such use or waste may be restrained, or damages recovered therefor; but, subject to these limitations, his power as owner is absolute until the Legislature shall, in the interest of the. public, as consumers, restrict and regulate it by statute.”
Cites the case of Jones v. Forest Oil Co., 194 Pa. 379,[1] wherein after quoting from Brown v. Vandergrift, supra, the Pennsylvania court said:
“From these cases we conclude that the property of the oivner of lands in oil and gas is not absolute until it is actually in his grasp, and brought to the surface.” (Italics by writer.)
Other cases from Indiana and Pennsylvania are then cited as supporting the doctrine that oil and gas, in situ, are insusceptible of ownership; and the opinion proceeds as follows:
“Without pausing to weigh the reasoning of the opinions of the Indiana court in order to ascertain whether they, in every respect, harmonize, it is, apparent that the eases in question, in aeoord with the rule of general law,, set- *139 tie the rule of property in the state of Indiana, to be as follows. Although in virtue of his proprietorship the owner of the surface may bore wells for the purpose of extracting natural gas and oil, until these substances are actually reduced by him to possession, he has no title whatever to them as owner. That is, he has the exclusive right on his own land to seek to acquire them, but they do not become his property until the effort has resulted in dominion and control by actual possession.” (Italics by writer.)
After considering an analogy between oil and gas, in situ, and animals ferae naturae (suggested in Brown v. Vandergrift, 80 Pa. 142), the opinion further proceeds:
“On the other hand, . as to gas and oil, the surface proprietors within the gas field all have the right to reduce to possession the gas and oil beneath. They could, not be absolutely deprived, of this right xohioh belongs to them without a taking of private property. But there is a coequal right in them all to take from a common source of supply the two substances which in the nature of things aré united, though separate. It follows from the essence of their right and from the situation of the things, as to which it can be exerted, that the use by one of his power to seek to convert a part of the common fund to actual possession may result in an undue proportion being attributed to one of the possessors of the right, to the detriment of the others, or by waste by one or more, to the annihilation of the rights of the remainder. Hence it is that the legislative power, from the peculiar nature of the right and the objects upon which it is to be exerted, can be manifested for the purpose of protecting all the collective owivers, by securing a just distribution, to arise from the enjoyment by them of their privilege to reduce to possession, and to reach the like end by preventing waste. This necessarily implied legislative authority is borne out by the analogy suggested by things ferae naturae which it is unquestioned the Legislature has the authority to forbid all from taking, in order to protect them from undue destruction, so that the light of common owners, the public, to reduce to possession may be ultimately efficaciously enjoyed.” (Italics by writer.)
“Viewed, then, as a statute to protect or prevent waste of the common property of the surfa.ee owners, the law of the state of Indiana which is here attacked because it is asserted that it devested private property without due compensation, in substance, is a statute protecting private property and preventing it from being taken by one of the common owners without regard to the enjoyment of the others. Indeed, the entire argument * * * involves a dilemma, which is this: If the right of the collective owners of the surface to take from the common fund, and thus reduce a portion of it to possession, does not create a property interest in the common fund, then the statute does not provide for the taking of private property without compensation. If, on the other hand, there be, as a consequence of the right of the surface owners to reduce to possession, ■ a right of property in them, in and to the substances contained in the common reservoir of supply, then as a, necessary result of the right ■of property, its indivisible quality and the peculiar position of the things to whioh it relates, there must arise the legislative power to protect the right of the property from destruction. To illustrate by another form of statement, the argument is this: There is property in the surface owners in the gas and oil. held in the natural reservoir. Their right to take cannot be regulated without devesting them of their property without adequate compensation, in violation of the Fourteenth Amendment, and this, although it be that if regulation cannot be exerted one property owner may deprive all the others of their rights, since his act in so- doing will be damnum absque injuria. This is but to say that one common owner may devest all the others of their rights without wrongdoing, but the law making power cannot protect -all the owners in their enjoyment without violating the Constitution of the United States.
“These considerations are sufficient to dispose of the ease." (Italics by writer.)
The opinion then deals with the argument of the plaintiff concerning the effect of the regulations, prescribed by the Indiana law upon the purposes intended to be accomplisned, and disposes of it by saying that the argument goes, not to the power to make the regulations, but to their wisdom, and that the court may not interfere with the discretion of the • Legislature. It then concludes as follows:
“In view of the fact that regulations of natural deposits of oil and gas and the right of the owner to take them as an incident of title in fee to the surface of the earth, as said by the Supreme Court of Indiana, is ultimately but a regulation of real property, and they must hence be treated as relating to the preservation and pro *141 tection of rights of an essentially local character. Considering this fact and the peculiar situation of the substances, as well as the character of the rights of the surface owners, we cannot say that the statute amounts to a taking of private property, when it is hut a regulation hy the state of Indiana of a subject tohioh especially comes within its lawful authority. Affirmed.” (Italics by writer.)
The first paragraph of the syllabus states that the regulation complained of does not take private property without due process of law:
“Since the owner of the surface has no property right in the gas or oil until he has actually reduced it to possession, or, if he has any property right therein, it is a right in common toith the coequal right of other landoimers to talco from the common source of supply, and therefore subject to the legislative power to prevent a destruction of the common property hy one of the common otvners.” (Italics by writer.)
The second paragraph declares, merely, that the doctrine that—
A “landowner, although entitled to bore wells for natural gas and oil, has no title to those substances until they are actually reduced by him to possession, is settled as a rule of property in the state of Indiana.” (Italics by writer.)
Considering the opinion as a whole, it appears to m’e that it recognizes the fact, which is undeniable, that the gas which plaintiff was allowing to be wasted had, first, and necessarily, been brought to the surface and reduced to possession, from which it must follow, as the argument concedes, that the ownership had then become vested in plaintiff; that, though the opinion may appear to deny that gas, in situ, beneath the surface of the land, is susceptible of ownership, it unquestionably asserts, and makes it the basis of the decree, that the gas in question was drawn from a supply owned in common by the owners of the various tracts beneath the surface of which it was found; and that it was competent for the Legislature to interpose and prevent one co-owner from wasting or making undue use of property so owned. Eronf which it would further seem to follow that, in referring to the question of the susceptibility vel non of gas to ownership, while beneath the soil, it was the intention of the opinion merely to recognize the doctrine, as stated in the last few words of the opinion, and in the second paragraph of the syllabus, to wit, that the doctrine of the insusceptibility of that mineral to ownership is a settled rule of property in the state of Indiana which it was within the lawful authority of that state- to establish.
In the very recent case of Walls v. Midland Carbon Co., 254 U. S. 300, 41 Sup. Ct. 118, 65 L. Ed. —, the plaintiff in the suit (appearing in the title as defendant, on the appeal) enjoined the officers of the'state of Wyoming from interfering with its use, under the supposed authority of a statute of that state', of natural gas, in the manufacture of carbon, by burning it, without sufficiently utilizing the heat, upon the ground that the heat was thereby wasted, to the prejudice of different communities which were drawing natural gas supplies from the same source.
“The question in the case is, as we have said,” reads the opinion, “whether the legislation of Wyoming is a valid exercise of the .police power of the state, and brings into comparison the limits of the power as against the asserted rights of property, whether it, the legislation, is a legal conservation of the natural resources of the state, or an arbitrary interference with private rights.”
It was held that the regulation of the use of natural gas, to prevent waste, was a com: petent exercise of the police power and of the power of the state to limit.the exercise of one right that others might be enjoyed.
It will be remembered, in considering the grounds upon which the opinions and decrees thus referred to are based, that, in the case now under consideration, there is involved no question of waste of natural resources» or of the consumption by a co-owner of an *143 amount in excess of Ms proportion of a substance owned in common. The plaintiff now before the court seeks to be decreed the owner of the oil and gas in dispute for the same reason that defendants’ authors in title reserved those products when they sold the land; i. e., for their pecuniary value, though neither plaintiff nor its author has ever paid any price for them, had no intention or expectation of acquiring them, and would, no doubt, have been much surprised if, at any time, within 8 or 10 years thereafter, it had been suggested that it had acquired them or was in a position to acquire them under any interpretation of any existing contract or statute.
The inconsistency, between plaintiff’s allegation that defendants acquired no ownership in the oil and gas, because, in situ they are not susceptible of ownership, and its allegation that it is the “absolute owner of the minerals, including oil and gas,” and its prayer that'it be so decreed, is obvious enough; but, apart from that, the doctrihe that the owner of the land has no property right in oil and gas, beneath the surface, and until he has reduced those minerals to possession, in no manner denies to such owner the exclusive right to the use of the surface for the purposes of such production, but, to the contrary, concedes that right, as inherent in the title to the land and subject only to the control of the state in the exercise of its police power, and the right May be sold' or reserved, and, if sold or reserved, carries with it the right of ownership in the oil or gas that may be found and reduced to possession, even though such right had not until then existed; so, that, in case either of a sale of the land, with a reservation of the mineral or mineral rights, or a sale of the minerals, or mineral rights, the owner of the mere surface of the land has no standing to claim the ownership of either minerals, or rights, and that is what was intended to be decided in Strother v. Mangham, 138 La. 440, 70 South. 426, which has been cited by counsel on both sides; it having been considered unnecessary, in that case, to decide, in more specific terms, the exact character of ownership of which oil and gas, while under the soil and undiscovered, are susceptible. Other cases have been decided by ’ this court (and the writer has a full share of responsibility therefor) in which the doctrine of the insusceptibility of the minerals in question to ownership, under the circumstances stated, has been accorded a passing, rather than a considered, recognition, as of a statement 'of a legal proposition not particularly affecting the matter before the court, though (as in Saunders v. Busch-Everett, 138 La. 1049, 71 South. 153) the statement appears to have been more seriously, but unnecessarily, made (in that instance by the present writer); the facts in that .connection being that the doctrine in question was accepted somewhat hastily, under a mistaken idea of the applicability of a certain precedent, assumed to be authoritative (see Rives v. Gulf Refining Co., 133 La. 184, 62 South. 623), and thereafter appears to have been taken for granted, probably because the question ivas not argued as it has been in this case. However that may be, I am now convinced that there was error in the rulings so made; that they are irreconcilable with the written law of the state; that far less injustice will be done by correcting and hereafter avoiding, than by persisting in, the error, and I conceive it to be the duty of the court to make the correction. I shall not lengthen this opinion by reviewing the cases to which I have referred, considering it sufficient to say that, in so far as they may be found to have sustained the proposition that natural oil and gas, or either, are not susceptible of ownership, though not perfect ownership, until *145 brought to the surface and reduced to posséssion, such interpretation of the law should now be overruled; it being well understood that, if the oil or gas' of which such ownership is predicated has no existence, the ownership has none, and if the oil or gas move or be moved, legally, from the estate beneath the soil of one owner to that of another, the ownership changes with the movement. There' is no prohibition in the law against, and nothing immoral or contrary to, public policy, in the recognition of ownership, subject to those conditions. To the contrary, two persons may contract with reference to the ownership of things known to be nonexistent, such as animals yet unborn, future crops, etc.; and the chance of their coming into existence may be assumed by the one party or the other, as they may agree; and our law expressly declares that bees and pigeons and fish (other than those that inhabit tree water) are susceptible of ownership, and hence are included among things that may be the subjects of sale, barter, exchange, donation, or any form of conveyance (notwithstanding that they possess in a marked degree the faculty of moving from one hive, pigeon house, or fish pond to another hive, pigeon house, or fish pond, and thereby changing their ownership). According to the law of this state, the owner of land may sell the elements of which it is constituted, in a lump, or separately, and what ho may' sell, he may except, reserve, withhold, or exclude from a sale; all that is required being the use of language, in a written contract, from which, or from which-considered in connection with the'surrounding circumstances, his intention and that of his buyer may be determined. It is true that, if a thing be nonexistent, there can be no ownership, and no sale; but the right to seek, take, and own it, if it be existent, may bo owned and may be sold; and, with respect to things beneath the soil, where the owner of the land and his buyer assume the existence of a particular clay, metal, or fossil, or of oil or gas, and sell or buy it. upon that assumption, together with the exclusive right to dig, bore, or explore in search of it, necessarily, through the soil, and the one' or the other assumes the risk of its existence, the contract is valid, for it contravenes neither law, good morals, nor public policy, since the governments, state and federal, which make the laws, establish the public policy and are authorized, to some extent, to regulate the public and private morals of the inhabitants, sell the public lands, if at all, upon much the same basis, save that they assume only the risk of losing the profit that might be gained by holding them. In conclusion, I may say that the question of the susceptibility vel non of oil and gas, while under the soil, to ownership, was distinctly put at issue in the comparatively recent cases of De Moss v. Sample, 143 La. 243, 78 South. 482, and Calhoun v. Ardis, 144 La. 311, 80 South. 548, and as distinctly decided in the affirmative, with no dissent, in either case, though, in the case first mentioned, in which there were several questions involved, two of the members of the court, as then constituted, concurred in the decrees, without assigning reasons.
For the reasons thus assigned, I concur in the decree this day handed down by a majority of the members of the court, in so far as it rejects plaintiff’s demands, at its cost, and dissent from that decree in so far as it awards plaintiff, and denies to defendants, the ownership, and right to explore, drill for, take, and appropriate the oil and gas underlying, or which mas' underlie, the 320 acres constituting the S. W. % of ¡Sec. 23 and S. E. % of Sec. 2G, involved in suits 8200 and 8203, and condemns them to pay costs.
SOMMERVILLE, J., concurs in this opinion.

 44 Atl. 1074, 48 L. R. A. 748.